## Case No. 8,995.

### MALONE et al. v. The PEDRO.[1]

District Court, S. D. Florida. Aug. 1878.

SALVAGE—MASTER — INTENT TO WRECK—REASONABLE PRECAUTIONS—CORRUPT AGREEMENT—BAR TO RECOVERY.

[1. In a salvage case a master's neglect of reasonable precautions to prevent wreck, and of reasonable efforts to remedy the same without help, is evidence that the ship was willfully wrecked by him.]

[2. In a salvage case facts tending to show that the master willfully caused the wreck may be considered, although not introduced by either party, and brought to the court's notice by accident.]

[3. The wrongful act of a master in wrecking his ship does not bar the claim of a salvor not in collusion with him.]

[4. Associates of a salvor with whom a master corruptly agrees to wreck his ship cannot recover salvage.]

[This was a libel for salvage by Samuel Malone and others against the American brig Pedro (S. J. Moulton, claimant). E. M. Stoddard intervened and contested the claim.]

L. W. Bethel, for libelant.

W. C. Maloney, Jr., for respondent.

G. Bowne Patterson, Jr., for intervener.

LOCKE, District Judge. This vessel, bound on a voyage from Nassau, N. P., to Falmouth, went ashore near Sandy Key to the westward of Grand Bahama, at about 20 minutes past 1 on the morning of the 14th of July last, and at daylight was boarded by the libelants; but, as the tide was rising, their services were not accepted, and she soon floated off. A pilot was then employed to pilot her into deep water. The next morning, while being piloted out, at about high water she again struck. The libelant came alongside with his vessel, the Fearless, took out 69 hogsheads and 15 barrels of sugar, carried out an anchor, and got her afloat, and came to Key West with her. So far the case is that of simple salvage service, and, was there nothing else alleged, would require but a few words to dispose of it. But another view of the case has been presented which demands a more thorough and careful examination of the relations existing between the master and Malone, the principal libelant. An intervening petition has been filed, alleging that the running ashore of said brig was in accordance with a corrupt and collusive understanding entered into between them, and, in behalf of parties interested in the cargo, praying that all salvage be denied. This collusion is positively denied by both masters, but the petitioner has been admitted as amicus curiae under a rule of court, and heard.

This view of the case can only be examined through the medium of the connection and

1 [Not previously reported.]

relation of circumstances, and is, as admitted by the petitioner, at best but a case of circumstantial evidence. Let us examine briefly, but carefully, the circumstances, and see what conclusion we reach. The brig Pedro was lying in the port of Nassau; also, the schooner Fearless. The master of each vessel knew the other by sight, and his position and occupation. The master of the schooner is shown to have been on board the brig twice, at least; apparently at one time examining some lumber that was to be sold, and again at the sale. At one time he met the master of the brig, and went into the cabin, as he says, to get a drink of water. He is also seen in the vicinity of the brig on the dock. On Wednesday morning at about 8 or 9 o'clock, the schooner sailed, ostensibly bound on a freight voyage to Key West, intending to call and get freight at Grand Bahama, as she was cleared for Bimini via Grand Bahama. That was, as the master says, anywhere along the Bahamas that he wished to stop to get freight. She reached Stirrup Key, a distance of about 50 miles, that afternoon, and her master says, the weather being squally, he went into Great Harbor, and anchored. The next morning he went to the lighthouse, and was advised by the light keeper to secure his vessel, as the weather was threatening. This he did, and remained at anchor Thursday, Friday, and Saturday morning. It does not appear that he took any freight at this place. In the meantime the brig Pedro had sailed from Nassau, at about 5 o'clock Friday, p. m., and passed Stirrup Key at a short distance that Saturday morning, at about half past 1. Between 5 and 6 the schooner got under way, and proceeded in the wake of the brig toward Settlement Point, the most westerly point of Grand Bahama, and the nearest to her destination. The vessels sailed within sight of each other during the afternoon and until evening, when the schooner came to anchor at Settlement Point. The brig kept on her course until 10 minutes past 10, when she rounded the point and stood up N. N. W. Captain Moulton, master of the brig, says that at 10 minutes past 10 this point bore due east, distant about 8 miles. Lunn, the first mate, introduced for petitioner, whose watch it was on deck, says it was but four miles distant.

This is the only essential point in the case upon which the testimony of the witnesses does not agree, and in determining the propriety of the course subsequently steered, it becomes a question of some importance. Distances, especially at sea, as well as space of time, unless accurately noted, are very liable to be mistaken and misstated in testimony, even by those the most truthfully disposed, and if there are any well-established circumstances which can be taken as a starting point to assist us in determining the truth, they should be examined. At 5 o'clock Saturday, p. m., before approaching Settle-

ment Point, while running on a N. W. course, the brig was kept off a half point. This is a fact shown by the testimony of the mate and the entries of the logbook, and one which no one could have any object in misstating. The brig was running N. W. with a N. E. wind, bound around Settlement Point, and every mile which could be safely made to the northward and eastward would be so much saved. I am satisfied that only one thing could have induced Capt. Moulton to keep off at this time, especially against an easterly current, as there then was, according to Malone's testimony, and that was a fear of approaching too near the shore. The brig must have been, therefore, at that time, 5 o'clock, approaching the coast of Grand Bahama nearer than he deemed prudent, and kept off, but, if his statement that, at about 10, Settlement Point was 8 miles distant is correct, he must have been running the course she was, with a reasonable allowance for leeway, 6 or 8 miles from the shore, which his changing his course disproves. Again, instead of examining his past course, to see what his position was, let us see what the result shows it to have been. At 20 minutes past 1 the brig struck, about 12 miles to the northward of the point, and, admitting the master's statement to be correct, more than 8 miles to the eastward of the course steered, and this with a northeast wind, which would show she had drifted 8 miles against the wind while making 12 miles headway with a fair breeze, as it appears there was that night. This is unreasonable, even allowing for a strong current setting in over the reef.

Both of these examinations show that the position given by the mate is without doubt correct, and the brig was not far from 4 miles west of Settlement Point when she was put upon a N. N. W. course. This course was as nearly parallel with the trend of the reef as could have been selected, and running on it in 3 hours and 10 minutes she struck. The course steered, together with the force of the current, was undoubtedly the cause of going ashore. The master admits, or rather claims, this, stating that it was the force of the current that put him ashore, and that he knew nothing about the currents but was guided by the charts. Accidents in navigation will constantly happen, and no man can be held accountable for ignorance of facts unless it is shown that he has been criminally negligent in not informing himself of them; and the question as to whether the stranding has been accidental or intentional depends upon, and can only be examined through, the knowledge the master is known to have had of the actual condition of the locality, currents, and winds. If a master has had his vessel swept ashore accidentally, by a current of which he was ignorant, or of which there is no reason to believe him informed, although the result is the same, the presumption is in favor of his innocence; but if the

circumstances are such that the presumption is of his knowledge, it is equally so of his guilt.

At the trial of this case, the master presented, as the chart by which he had been governed at the time of going ashore, a new chart, having no indications, by arrows or otherwise, of the currents; but accidentally a chart, having designated upon it plainly and distinctly a strong current flowing directly on to the reef where this vessel struck, came to the notice of the court, and, upon inquiry, was admitted by Capt. Moulton to be his property, by which he had been sailing previously, but not the one by which he had been sailing that day. This information came to the court incidentally, and the question whether it could properly be considered in this case has been duly weighed. It is true it was not introduced by either party, but it was important in the case, as showing conclusively that the master had in his possession the means of being well-informed of the current which had driven him ashore, and of which he had stated his ignorance. The matter was brought out during the trial, while all parties were present, and Capt. Moulton permitted to make any denial or explanation he saw fit. There is no doubt in my mind of the propriety of accepting the fact thus shown, and giving it due weight. It is probably true that it was not the chart that had been used that day, but the new chart which had been used, only extended to the vicinity of Stirrup Key, and this one must have been in use since leaving Nassau. To any one carefully examining this question there must be a very strong presumption that the master was informed of the currents as shown on that chart. Can it be possible that a capable and intelligent master, as I believe Capt. Moulton to be, a seaman and navigator of experience, could have been ignorant of the currents on a dangerous reef along which his voyage was leading him, when he must have had in use for weeks a chart upon which they were as plainly shown as flying arrows on a chart could portray a current?

The well-known course of the Gulf Stream, a current so generally known among seafaring men, by being shown on all charts, even the one introduced at the trial of this case as having been in use by the master of that day, would have demanded the attention of any careful man, and raised the question whether there was not a current setting in over the banks along whose edge he was sailing. I must again say that the presumption that the master of the brig was informed of this current is so strong as to preclude even a reasonable doubt. But the fact that the master was aware of a current does not necessarily show that he was not deceived in its directions or force, the strength of the wind, or speed of his vessel, and innocent of any intentional wrong in permitting his vessel to run aground. Let us examine his conduct further. At 20 minutes past 1 his vessel struck, with the shoal water to the windward. The wind was favorable. The vessel had been going but about five knots, and the master found that it was about low water. There was a full moon that night, and high tide. The sea was smooth, there being a light breeze from the eastward, and the master had a boat sufficient to carry out an anchor. The mate, who had served in a surveying vessel in the vicinity, and was well acquainted with the locality, says an anchor could have been carried out and she got off into deep water by going half her length. He asked if he should not carry one out, but the master replied, "No," that he did not want to hurt his boat. The sails even, were not used in attempting to float her as the tide rose. What would have been the course of a master sincerely regretting the disaster, and anxious to remedy it at once with the least expense to those whose property was confided to his custody? What could have prevented the carrying out of an anchor, and how promising must have been the prospect of success? No excuse has been offered; no denial of the reply made to the inquiry of the mate. Nothing was done toward relieving the vessel from the bottom. All such idea seems to have been at once abandoned, and the idea that she could not be floated without discharging accepted, as the master told his crew they might all turn in, as probably they would have to discharge the cargo on the next day. Under the circumstances, the fact that the master, instead of making some effort to relieve his vessel, caused signals to be displayed, by putting burning rags dipped in oil in the crosstrees, and accepted the idea that his cargo must be taken out, argues either gross inefficiency or willful neglect of duty. The next morning, as the tide rose, it appeared that the brig would float off without assistance, and nothing was done either to relieve her or control the direction of her coming off. So she was permitted to drift over the shoal upon which she had struck into a position from which the master considered the services of a pilot necessary to extricate her. In the meantime the look out on board of libelant's vessel, the Fearless, lying at anchor 11 or 12 miles distant, saw the signal light, very soon, if not immediately, after it was made, and reported it to Malone. He at once took on board 11 extra men from the shore, got under way, and was at the brig, ready to render assistance, the first thing in the morning; but the vessel was nearly afloat before his arrival, and his services were not accepted. It has been argued that the refusal of Capt. Moulton to employ Malone, or permit him to assist his vessel at this time, is a conclusive answer to the charge of collusion. Had he used every power of his own to rescue his vessel, and taken such precautions as had prevented a further disaster, this would, I grant, have

been so; but he did neither, and the result was apparently much more favorable to Malone, than had his services been accepted in the first instance. The vessel was about floating, and shortly after she drifted off by the force of the current. There was at that time no opportunity to discharge cargo, carry out an anchor, or render any apparently valuable service, so as to deceive the most simple as to its necessity.

A man will seldom if ever commit a crime without a motive. In the present instance what motive, if any, could have actuated Capt. Moulton to have entered into a collusive arrangement for the procuring of an opportunity to assist his vessel but a chance to make money for himself? And this could have been accomplished only by a division of salvage with the master of the vessel assisting him. Had assistance been rendered the first time ashore, no court or board of arbitrators could have given any considerable amount of salvage, and the service would have been as nothing compared with what a subsequent opportunity offered. The result shows that if there was at that time a collusive understanding with Capt. Moulton, the very course was taken to not only enable him to share more largely, but at the same time relieve him in a great degree from responsibility of the disaster by having his vessel in charge of a pilot. After his vessel had been permitted to drift over the shoal upon which she had struck into difficult navigation, Capt. Moulton brought her to anchor and inquired for a pilot, and one Hanna, belonging to another wrecking schooner which had arrived, presented himself, with good recommendations, and was accepted, with the understanding, as Moulton says, that if he got the brig out clear he was to receive $200. The master of the Fearless testifies in the main case that he left the brig just after she floated, and started on his Key West trip, and, in speaking of Hanna, selected as pilot, disclaimed any acquaintance with him, speaking of him contemptuously as if he would scorn the idea of any intimacy; yet we find, upon a further examination of the case, that, after Hanna had been employed as pilot Malone took him on board his vessel, the Fearless, where they remained from an hour to an hour and a half, and upon coming back to the brig both went aft and had a conversation with Capt. Moulton and that, instead of starting on his Key West trip, he remained on board the brig nearly all day, and, upon leaving, anchored his vessel for the night but about four miles from her. Lunn, the mate, states that, while lying at anchor that day, upon his asking the pilot if he thought he could get her out, he pushed up against him and, in reply, asked: "Why; do you want her to come out?" This remark, in view of the surrounding circumstances, convinces me that there was in the mind of the pilot the idea that there were some who did not want her to come out, and that that idea had come to him in such a manner that he had no fear in mentioning it to even the chief mate of the vessel. Had the vessel finally come out safely, we might look upon this as a meaningless remark, but as the result shows she did not come out, it becomes one of no small significance.

It is intimated by the claimant that there may have been collusion between the libelant, the pilot, and the mate. Everything tends to disprove the mate's complicity, and nothing to support it. He could have had nothing to do with first running the vessel ashore, and was the most ready in suggesting means to get her afloat. It is beyond his power to influence the employment of assistance, and there was no need of his aid, or motive for him to engage in such a scheme. Such idea is too unsupported to require a moment's consideration. But is it at all probable that the pilot would have suggested this idea of some one's not wanting the brig to come off to the mate, unless he had reason to believe some one beside Malone and himself were in the plot? This remark of the pilot explains what followed. The next morning the brig got under way with a light, fair wind, she heading N. W. with a S. W. wind. The water was so clear that, as Malone says, you could see anything on the bottom distinctly, and he found no necessity for sounding to ascertain the depth when wanting to carry out an anchor soon afterward. She was drawing less than 10 feet, in charge of a pilot whose home was in the immediate vicinity, and to whom the bottom must have been as familiar as his own dooryard. It was high water. Yet, notwithstanding all these favorable circumstances, no sooner had the tide commenced to fall than she struck again. Libelant Malone, whose vessel was still at anchor, waiting apparently until wanted, was soon on hand ready to assist, and his crew was employed to discharge cargo, carry out an anchor, and get her afloat. This they did during the day, and brought her to anchor for the night. Capt. Moulton's course toward the pilot Hanna, after his vessel is again afloat, appears open to severe criticism, and adds materially to the accumulated presumption of bad faith. Although Hanna had, after his employment as pilot, been on intimate terms with Malone, and, after undertaking to pilot the brig out, had got her aground without, as I can see, the least extenuating circumstances, and given him an opportunity to earn a large salvage, yet Capt. Moulton appears to have had no suspicions of him, but on the contrary says that as he had not then got out from among the shoals he still wanted his assistance. He kept him on board his vessel, and brought him to Key West, a distance of nearly 300 miles. He had come but a short distance from home for an apparently temporary service; had been employed conditionally, and failed in his undertaking, forfeited all compensation, and not only that, but given Capt. Moulton a right

to have any feeling but a kindly one towards him; yet, notwithstanding this, he sets him to taking account of cargo, and permits him to remain on board and do duty in place of his first mate, who had sprained his wrist. In explanation, Capt. Moulton says: "When we passed Settlement Point, where the pilot belonged, we were some 6 or 8 miles distant, and the pilot said it would cost him something for a boat to get ashore. He wanted to go to Key West to see some friends, and asked me if I would take him, which I consented to do, telling him he might have to work, as my mate had sprained his wrist."

Now let us see how this explanation agrees with the facts of the case. Both Capt. Moulton and Malone say they first started for Nassau, until the wind came ahead. Now, if bound towards Nassau, with the current of the Gulf Stream sweeping rapidly to the northward, why was Capt. Moulton 6 or 8 miles distant when passing Settlement Point when the Fearless had anchored within 800 or 900 feet of the same shore? Again, the Fearless had on board 11 men, whom she landed at the Point, and the brig was in company and exchanged passengers, showing conclusively that, while there, there was communication both between the Fearless and the shore and the brig and the Fearless, which offered every opportunity for the pilot's going ashore. If the brig was shorthanded, the Fearless had an overbundant crew, whose interest in her not only permitted but demanded that they should furnish help to work her into port. If the pilot was anxious about the amount he says it would cost him to get ashore from the brig Pedro, how did he contemplate returning from Key West, unless he had such a claim on Malone as would authorize him to demand a gratuitous passage, or he was expecting to receive compensation for some service? Notwithstanding the fact that he had run a vessel ashore with no possible excuse, and lost the $200 he was to have earned, he takes the matter so coolly as to immediately plan a visit to some friends at a distance, and had the audacity to ask a passage for nine days' voyage from the man he had so recently injured. Can it be believed that he considered he had lost his $200, or greatly offended Capt. Moulton? The presumption that his object in coming to Key West was rather to look after interests that he had in the hands of Capt. Moulton or Malone is too strong to be easily overcome. The coming to Key West, a distance of 270 miles, the greater part of the way directly against the current of the Gulf Stream, instead of going to Nassau, but 150 miles, with a favorable current, which is said was on account of head winds, although of but slight importance, yet favors the hypothesis of collusion rather than otherwise, as in all such cases it is desirable to remove the place of examination and settlement as far as possible from the place of agreement, where personal association and intimate relations might be more

easily proven, and suspicious circumstances more readily remembered. The same may be said of the discharge of the brig's crew. Yet these are not inconsistent with an hypothesis of innocence, and were it not that they add to the presumption, already so strong, I should not mention them at all.

Reviewing at a glance the entire case, we find that the schooner left Nassau, waited two days and a half at Stirrup Key until the brig had come out and passed her, when she got under way, passed the brig, and is again passed by her, while at anchor at Settlement Point. The brig, while in sight a few miles beyond, is driven ashore by a current shown distinctly on a chart which had been in use by her master within 36 hours, at the furthest, before. Every circumstance promised an easy relief from the difficulty, but not an effort was made, but instead a signal light was displayed, and the crew told they might turn in, with the remark that they would have to discharge cargo the next day. This satisfies me that the master was willing she should remain there until discharged, and that, had he not been willing for her to go ashore, he would not have been so willing for her to remain; that in this he must have had some motive, and that motive must necessarily argue an understanding and agreement with some one by whose assistance money was to be made. The facts of the association of Malone with the pilot Hanna, and the subsequent running ashore of the brig, and that these awoke no suspicion in Capt. Moulton's mind, as well as the fact that the pilot was possessed of the idea that some interested parties were willing that she should not come out, satisfy me that the second grounding was neither accidental nor unintentional.

Wreckers are not responsible for the misconduct of masters in intentionally stranding their vessels, if innocent themselves of any collusion. The fact that Capt. Moulton ran his vessel ashore intentionally, or permitted her to go ashore through criminal neglect does not prove that Malone, by assisting him in relieving her, became a participant in his guilt. The guilt or innocence of Capt. Moulton has nothing to do with the question on trial, unless Malone is shown to have been implicated. Let us see how far he had been connected with the brig before his assisting her, and what will be a reasonable conclusion as to his knowledge of Capt. Moulton's intentions. He was in company with Capt. Moulton in Nassau. He came out, and although bound on a freighting voyage to Key West, stopped at Stirrup Key, where no freight offered, until the brig had passed in plain sight, then steered to the last port nearest his destination and came to anchor, although he had taken in no freight, but had cleared with the declared intention of stopping at the several ports of the Bahamas for cargo. The signal of the brig was seen almost immediately

upon its being made, and so confident was he that there would be something to do that, although he had then a crew of 12 men, coming to anchor as he did about quarter past 8 in the evening, and getting under way at about 2 in the morning, he procured in the meantime 11 men from ashore. His was the first boat at the brig. He was in communication with the pilot and took him on board his vessel. He spent the greater part of the day on board the brig, and he and the pilot were aft in conversation with the master by themselves. He anchored his vessel that night where the brig could be easily reached. There was sufficient wind for the brig to get under way in the morning, but the Fearless, with her extra crew, remained until again needed, and was the first ready to render assistance. If it was the intention of Malone, at the time of clearing from Nassau, to stop at but one point, and he was willing that that should be known, it would naturally be presumed that he would clear for Bimini via Settlement Point; but if he intended to stop at other points, why do we find him leaving all such behind him for the sake of being at Settlement Point at a certain time? The moment we conclude that Capt. Moulton intended to permit his vessel to go ashore, we must also conclude that he had a partner in the arrangement. Nothing could be made without a division of earnings, and he was not going to risk the consequences with 'no prospect of compensation. The idea of a co-conspirator can point to no one but Malone.

It is not necessary to show the character or extent of the collusion, or whether they entered into any particular agreement in relation to the part which each was to act, or the proportion of the spoils each was to share. It is sufficient to show such a state of facts as induces a reasonable presumption that they understood each other, and understood that the property was to be put in jeopardy, and something could be made by assisting it. I am not unmindful of the importance of the conclusions reached to the parties interested, but I have not arrived at them without a critical examination of the facts in their every bearing, and until satisfied that the circumstances are utterly inconsistent with the idea of innocence. These circumstances, each one perhaps trivial in itself, when united and examined together, form in my mind proof of collusion as nearly positive as the ordinary connection between known and inferred facts' may ever permit. No party associated in any way with libelant Malone can receive anything, and the libel must be dismissed.

[NOTE. At a subsequent date, F. Englehard & Co.. filed a libel, in this court, against the Pedro, for damages to cargo. In the meantime the vessel had been sold under a decree entered in this cause, and the proceeds brought into court. The damages proven by Englehardt & Co. far exceeded the whole proceeds from the sale of the vessel. So at this hearing it was decreed that the libelant should receive the whole proceeds of the sale, after the payment of all costs, expenses, taxes, wages of the crew, and the costs of the suit then before the court. Case No. 4,489.]